Law Offices
Adam N. Bleier, P.C.
**Adam N. Bleier**
2 E. Congress Street, Suite 1000
Tucson, Arizona 85701
Phone: (520) 319-0785
Email:adam@adambleierlaw.com
State Bar No. 022122

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States, ) | |
| ) | 4:19-CR-02162-JGZ-EJM |
| Plaintiff, ) | |
| ) | |
| vs. ) | **WRITTEN ARGUMENT RE:** |
| ) | **MOTION TO SUPPRESS STATEMENT** |
| Ahmed Mahad Mohamed, ) | |
| ) | |
| Defendant. ) | |
| ) | |

The Defendant, AHMED MAHAD MOHAMED, through undersigned counsel, Adam N. Bleier, Adam N. Bleier, P.C., hereby submits this written argument in support of his Motion to Suppress Mr. Mohamed's post-arrest statement to FBI agents. This Memorandum below is based upon the pleadings, testimony and exhibits presented by the respective parties on April 7 and June 16, 2023. Counsel intends to forgo an extensive review of the facts presented at the two days of hearing in this case, but rather argue those facts *in lieu* of an oral argument.

A. *Issue Before the Court*

The issue before the Court is whether Mr. Mohamed's waiver of his right to remain silent in the face of law enforcement questioning and have the presence of counsel during such was voluntarily, knowingly, and intelligently obtained by the Government. The primary focus of the Court should be on the latter two requirements – "knowingly" and "intelligently" – as Mr.

1

Mohamed has not argued that he was forced or coerced into waiving his rights, though he contends that the agent's communication of rights that led in part to his inability to waive his rights knowingly and intelligently.

The *Miranda* warnings are part of the American cultural fabric for those of us who have lived here for a substantial period and have consumed popular American culture. We are familiar with the language of the warnings through television shows, movies, and music, and it is generally used as a signifier that someone has been arrested. Through this omnipresence in popular media, the warnings themselves have become a cultural cliché, the underling meaning of which has dulled over time. Of course, these warnings are not just something in a television show, but rather embody important constitutional rights – the right to remain silent and the 5th Amendment right to counsel – which the Supreme Court has repeatedly upheld.

*Miranda* itself states that "a **heavy burden** rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel". 434 U.S. at 475. (Emphasis supplied). In setting forth the test to determine whether a waiver was lawful, the Supreme Court used even more muscular language in *Moran v. Burbine*, 475 U.S. 412, 421 (1986), writing:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. **Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."**

*Id.* at 421. Thus, in the context of this case, this Court must determine whether the Government has demonstrated that Mr. Mohamed was "fully aware" of the nature of the right being abandoned and what the consequence of that abandonment would be.

In *United State v. Garibay,* the leading Ninth Circuit case on the issue, the court set forth

*ADAM N. BLEIER, P.C.*
2 E. Congress Street, Suite 1000
Tucson, Arizona 85701

specific factors to be used in determining whether, under the totality of the circumstances, a defendant had voluntarily, knowingly, and intelligently abandoned his 5th Amendment rights. The factors to consider are whether the Defendant:

(1) signed a written waiver;

(2) received the advice of rights in his or her native language;

(3) appeared to understand those rights;

(4) had the assistance of a translator;

(5) received a painstaking explanation of his rights; and

(6) had experience with the American criminal justice system.

*United States v. Amano*, 229 F.3d 801, 804-05 (9th Cir. 2000); *United States v. Garibay*, 143 F.3d 534, 538 (9th Cir. 1998). Considering these legal factors and their application to the facts of this case require this Court to grant the motion to suppress.

B. *Argument*

a. *Cultural Background and Lack of Experience with the American Legal System*

First, this Court should consider the unchallenged testimony regarding Mr. Mohamed's cultural background, relative recent contact with American culture, and lack of contact with law enforcement, all of which go to the issue of whether he was fully aware of the nature of the right he was abandoning. Through the testimony of Ahmed's father, Mahad Moalin, this Court learned that Ahmed came to this county in 2014, 5 years before his arrest which occurred when he was 21 years old. His father and his family had fled war-torn Somali when he was a small child and settled in a refugee camp in Uganda called Nakivale. His existence prior to coming to this country was bleak; his family lived in a tent for 8 years; he suffered through numerous bouts of malaria and almost died before his father obtained refugee status for him and his family to come to the United

*ADAM N. BLEIER, P.C.*
2 E. Congress Street, Suite 1000
Tucson, Arizona 85701

3

States.

When Ahmed arrived in the United States, he had little formal education and no understanding of English.

In the United States, Mr. Mohamed lived in a small home in which only Somali was spoken. The family was part of the small local Somali community. His mother, Nimo, to this day speaks no English. Only Somali programs are watched on the television in their home. He communicates with his parents and family in Somali.

Ahmed attended Amphitheater High School and Catalina High Magnet School At those schools, he attended ESL classes, and while he struggled in school, he graduated after Mahad was able to obtain proof that he had had some schooling in Uganda. Ahmed has no prior law enforcement contact or experience with the American legal system, to say nothing of the criminal justice system. His only arguable contact with the legal system involved the submission of legal paperwork to obtain his LPR status, and this paperwork was not filled out by him but rather with the assistance of the International Rescue Committee (IRC) a support organization for refugees, the same organization Ahmed went to when he allegedly sought to obtain travel documents in this case. He could not fill out these forms by himself.

Following his graduation, and during the period while he was under investigation, he worked as a direct care provider, which is an orderly providing day-to-day assistance to adult patients. In obtaining this job, Ahmed followed in the footsteps of many African immigrants who work as orderlies or basic care providers in medical facilities throughout the United States.

There is no evidence before the court that Mr. Mohamed had American friends and understood American culture.

4

*b.   Mr. Mohamed's English*

The defense has never disputed that Mr. Mohamed spoke and texted in the English language to the UCE and other undercover individuals working for or with the Government.   He clearly developed an ability to communicate with other like-minded individuals and undoubtedly consumed a lot of Islamic State propaganda and news related to it. This Court is familiar with the snippets of recordings played repeatedly by the Government at the hearing. These recordings, in addition to the testimony Agent Mutari, underscore the fact that virtually all the conversations revolve around jihad, the "kuffar", Islamic religious ideology and the Islamic state.  In addition, these conversations, aside from the hours during which the UCE and Mr. Mohamed cheer on each other's political and religious beliefs, include expressions of Mr. Mohamed's desire to leave the country and travel oversees along with the steps that need to be taken to achieve this.

The recorded conversations, and testimony of Agent Mutari, demonstrate Ahmed's ability to narrate past and future events, express his desires and discuss areas of particular interest.   This level of English ability is equivalent to the ILR 2 (speaking) and 2+ (listening) to which both experts testified at the hearing.  This is the level of speaking about and understanding *routine* social demands and *limited* work requirements.  This is the level of understanding basic social situations and casual conversations.  This language ability, however, does not equate to an understanding – a full awareness –  of his Fifth Amendment rights and the consequences of waiving those rights.

This is further made clear by the testimony of Dr. Leonard and the research of Dr. Pavlenko, the latter who has demonstrated in her research that non-native university students, presumably much more highly educated than Mr. Mohamed, have significant problems in their ability to understand the *Miranda* rights.  Dr. Leonard's testimony further clearly demonstrated that *Miranda* is a different than simple, routine language – due to the embedding of the terms and

complex conceptual nature -- than everyday English conversation.

While Dr. Brooks is certainly an expert in language testing, especially within the realm of government employees, her background underscores her bias. Her entire career as a linguist has been within the bubble of the FBI and the federal government. She oversees the testing of people seeking to join the FBI. These are generally highly educated individuals, unlike Mr. Mohamed. Her testimony that *Miranda* is simply the same language that we speak everyday (Level 2) ignores, the multiple embeddings in the recitation, and that key phrases of *Miranda* are grouped together and as such contain a meaning and significance far beyond the everyday meaning signified. In fact, much of the disagreement between Dr. Leonard and Dr. Brooks goes to whether the *Miranda* rights are inherently easy or difficult to understand.

The Government went to great lengths to attempt to attack Dr. Pavlenko's research by suggesting that the conversion of the language evaluation scales was poorly done by Dr. Leonard and Dr. Pavlenko, and that the subjects of the research were not properly evaluated. They also pointed to the high number of native speakers who did not understand *Miranda* as evidence that the study was flawed. While certainly more research is necessary in this area, as agreed to by Dr. Brooks, the research clearly presents an uncomfortable truth that even educated non-native English speakers do not understand their legal rights in this country, even when administered to them in a non-custodial setting. Clearly, Mr. Mohamed, a 21-year-old Somali refugee with a degree from an underperforming high school and little formal education prior to his few years of formal schooling, did not understand English as well as the subjects of this research experiment.

For these reasons, Mr. Mohamed's level of English was not sufficient to understand his *Miranda* rights.

*ADAM N. BLEIER, P.C.*
2 E. Congress Street, Suite 1000
Tucson, Arizona 85701

6

*c. Communication of the Rights*

The administration of the *Miranda* rights in this case was also extremely problematic and, in conjunction with Ahmed's language ability, led to a legally inadequate waiver of his rights. The Court should be troubled by the fact that the FBI agents had secured the presence of interpreters and had obtained a copy of *Miranda* rights but failed to provide this assistance to Mr. Mohamed. Obviously, the Government at some level of the investigation was concerned about the language and *Miranda* issue and went through the steps to secure language assistance. The Government repeatedly insisted, through both of its witnesses, that a translation of the advisement and that interpreters were offered to Mr. Mohamed. However, this is distorted reading of the interaction. (Exhibit 2 at 3-5).

The defense submits that the offer of a translator was illusory. First, Agent Edwards reads the *Miranda* rights in English. This reading is done as a whole, there is no "painstaking explanation" (*Garibay)* of his rights in an individual manner, and, importantly, Mr. Mohamed is not "offered" an interpreter or written advisement of his rights in Somali prior to the reading of his rights. It would have been a simple question at the commencement of the interview: "Do you prefer English or Somali?" "We have an interpreter available. Would you like to use him?" "We have your rights here in Somali, would you like to review them?" Rather, the agent, who may have seen the advisement as an impediment[1] to the interrogation, reads the rights in English and hands the piece of paper to Ahmed to read.

Then comes the first "offer" of a translator. "So I'll let you review this. If you have any,

---

1 Agent Edwards: "…Alright so, anytime we're gonna talk to someone like this especially if we bring them in the office… we're gonna advise you of your rights okay? Uhm, which I have to do. So I'm gonna read this to you, I'm gonna let you review it, make sure you understand it, and if you understand it, sign it and then we're gonna talk, ok?" *Id.* at 3.

*ADAM N. BLEIER, P.C.*
2 E. Congress Street, Suite 1000
Tucson, Arizona 85701

questions, make sure and ask me. If you don't understan-I know you speak English pretty well, if you don't understand something… Well we'll get it – we'll get in translated."[2] Of course, this was a deceptive statement as Agent Mutari had the translation in his folder on the table; this was not a process that the agents had to undertake. After that statement, Agent Edwards condenses the written advisement he handed to Ahmed into a simple sentence: "So, read it, and if you want to talk that's where you sign right there at that x." Then Ahmed looks at the paper, Agent Edwards starts scrolling through his phone. When Ahmed looks up his lack of understanding surfaces: "So-so-so- I have translate or?" Then Agent Edwards states: "If you come to a point uhn…that you're not understanding the English or you don't feel comfortable I can go get a translator or I can try and bring one in here for you right now." Again, this is somewhat deceptive, given that there is an interpreter in the building. Furthermore, given that an interpreter or translation was not offered prior to the verbal administration of Miranda, it is unclear whether this exchange is forward looking to the interview itself ("if you come to a point") and thus presuming his understanding of *Miranda*. Mohamed then responds using many of the same words and the "if, then" phrasing that Agent Edwards had just used: "If I don't understand – yeah you will give me a translator." Then Ahmed asks: "So you want me to sign here?" This statement itself is indicative that he did not understand Agent Edwards original statement as to where he needed to sign. In a concise summary of *Miranda*, Agent Edwards responds: "Yes, if you wanna talk with us, sign here."

Therefore, the advisement of rights in this case was inadequate and provides evidence that Mr. Mohamed lacked a full awareness of the nature of the rights and the consequences of waiver. Focusing on the *Garibay* factors listed above further supports this. First, Mr. Mohamed did sign written waiver – in English. The Somali waiver was kept hidden in the Agent Mutari's folder. Secondly, he did not

---

2 The "offer" of a translator here is like someone saying, "You don't really look thirsty, but I'll go get you glass of water if you want."

receive the warnings in his native language. Of note, *Garibay* does not discuss this in terms of an "offer" which was how the testimony was framed at the hearing, due in part to the AAAL guidelines which are discussed in both expert reports. The relevant *Garibay* factor simply asks this Court to look at whether he provided with a translation. As to the third factor, he arguably appeared at the time to understand the rights in the sense that he voiced no disagreement, and he signed the written waiver in English. However, later in the interview, when discussing giving the agents the pin code to his phone, he states that he is surprised to learn that he has rights. As to the fourth factor, he did not have the assistance of a translator. Again, at the hearing the Government's witnesses repeatedly claimed that this was offered; however, he was not provided with one and this is how *Garibay* frames that factor. ("Although translators were available at the time of Garibay's arrest, they were not brought in to help question him.") 143 F.3d at 538. Fifth, Mr. Mohamed did not receive a "painstaking" explanation of his rights. Finally, Mr. Mohamed has no experience with the criminal justice system. While the Government will point to the fact that he was aware that he could be arrested, through his statements and his transmission of news articles about ISIS members, this does not mean he had any familiarity with the operation of the criminal justice system. Thus, the application of the *Garibay* factors clearly supports the suppression of Mr. Mohamed's statement in this case.

d. *Conclusion*

Due to the ubiquity of the words of Miranda, the waiver of two important constitutional rights – remaining silent and the right to counsel during questioning – is frequently overlooked and often ignored by both courts and practitioners. However, one may ask why the waiver of this right should be treated differently than, for example, a plea proceeding in which a defendant such as Mr. Mohamed is provided with an interpreter. This point is underscored by the Government's unilateral decision to provide an interpreter for Mr. Mohamed at the proffer in this case, which

*ADAM N. BLEIER, P.C.*
2 E. Congress Street, Suite 1000
Tucson, Arizona 85701

9

occurred two years after his arrest. There, the interpreter translated the *Kastigar* waiver for Mr. Mohamed.

Therefore, balancing the *Garibay* factors and the totality of the circumstances in this case, this Court should grant the motion to suppress. At the time of his arrest, Mr. Mohamed was a 21-year-old refugee with limited English ability and no prior experience with the American legal system. His ability to speak English, the administration of the warnings, along with the expert testimony provided by Dr. Leonard, support granting the Motion to Suppress.

**RESPECTFULLY SUBMITTED** this 30th day of June 2023.

*/s/ Adam N. Bleier*

Adam N. Bleier
Counsel for Defendant

Original of the foregoing filed this date with the Clerk of the U.S. District Court.

A copy of the foregoing delivered electronically this date to:

Bridget Minder, Esq.
Beverly Anderson, Esq.
Chris Curran, Esq.
John Cella, Esq.
U.S. Attorney's Office
405 W. Congress, Suite 4800
Tucson, Arizona 85701

Dan Cooper, Esq.
Amy Kraus, Esq.
Attorney for Co-Defendant

*ADAM N. BLEIER, P.C.*
2 E. Congress Street, Suite 1000
Tucson, Arizona 85701