GARY M. RESTAINO
United States Attorney
District of Arizona
M. BRIDGET MINDER
Arizona State Bar No. 023356
CHRISTOPHER A. BROWN
LIZA M. GRANOFF
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: Bridget.Minder@usdoj.gov
Email: Christopher.Brown7@usdoj.gov
Email: Liza.Granoff@usdoj.gov

MATTHEW G. OLSEN
Assistant Attorney General
U.S. Department of Justice
National Security Division
JOHN CELLA
Trial Attorney
Counterterrorism Section
950 Pennsylvania Ave, NW
Washington, DC 20530
Telephone: 202-305-1601
Email: John.Cella@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | |
|---|---|
| Plaintiff, | CR 19-02162-TUC-JGZ (EJM) |
| vs. | **GOVERNMENT'S TRIAL BRIEF** |
| Ahmed Mahad Mohamed and Abdi Yemani Hussein, | |
| Defendants. | |

Pursuant to the Court's Pretrial Scheduling Order, the government submits this trial brief. (Doc. 320 at 4.)

///

///

1    **I.    Statement of Facts**[1]

2         Defendants are Somali nationals who came with their families to the United States

3    after spending several years in refugee camps in Africa, attended high school in Tucson,

4    and were living and working in Tucson in 2018 and 2019, at the time of the offenses.

5         Defendants are also ISIS supporters who conspired and attempted to travel overseas

6    to join the foreign terrorist organization (FTO).  Starting in 2016 and continuing into mid-

7    2018, Mohamed was consuming ISIS propaganda, participating in various pro-ISIS groups

8    online, and messaging with other ISIS supporters about making *hijrah*[2] to the Middle East

9    to join ISIS.  On August 13, 2018, Mohamed sent a direct message on Telegram to an

10   individual who he knew to administer a pro-ISIS channel on Telegram, an encrypted

11   messaging app.[3]  The individual Mohamed messaged was an FBI online covert employee

12   (OCE-2).  Mohamed exchanged messages with OCE-2 between August 13, 2018, and

13   December 3, 2018.  Mohamed's messages discussed, among other things, his goal to make

14   hijrah to the Middle East, join ISIS, kill *kuffar*[4], and die as a martyr. OCE-2, whose online

15   persona was of an ISIS member located in the Middle East, will testify at trial about the

16   messages Mohamed sent him (Exs. 1-37[5]).

17

18         [1]  This statement briefly summarizes relevant facts and the government's anticipated
19   evidence but is not an exhaustive recitation of the facts or expected evidence.

20         [2]  Hijrah is an Islamic term meaning "migration." The term historically refers to the
     journey undertaken by the Islamic prophet Muhammad from Mecca to Medina. In a
21   modern, extremist context, the term "hijrah" has been used to describe a foreign fighter's
     journey from his/her country of origin to terrorist-held territories abroad. *See*, *e.g.*,
22   https://www.counterextremism.com/glossary.

23         [3]  *See* https://telegram.org/faq. In addition to exchanging direct messages, Telegram
     users can create "groups" for up to 200,000 people, in which anyone can write messages
24   to the group, or "channels" for broadcasting to unlimited audiences, in which only
     administrators can post. *See* https://telegram.org/tour/channels.

25         [4]  Kuffar or kafir is an Arabic word meaning "nonbeliever" or "infidel." Variations
26   include kaffir and kufar. *See*, *e.g.*, https://www.counterextremism.com/glossary.

27         [5]  Exhibit numbers refer to the government's exhibit list for trial, which was initially
     provided to defense counsel on August 11, 2023. An updated version of the government's
28   exhibit list was provided to defense counsel on March 1, 2024 (the only changes being the
     addition of certified exhibits from the Arizona Department of Transportation).

In early December 2018, OCE-2 told Mohamed he could connect him with a "trusted brother" in the United States who could help Mohamed make hijrah. OCE-2 provided Mohamed with the Wickr handle for an FBI undercover employee (UCE) whose persona was that of an American who converted to Islam and had contacts within the ISIS organization. Mohamed reached out to the UCE on December 3, 2018, and quickly told the UCE about his goal to make hijrah, join ISIS, kill kuffar, and become a martyr. Between December 2018 and his arrest on July 26, 2019, Mohamed sent thousands of messages to the UCE on encrypted apps, Telegram and Wickr, and became Facebook friends with the UCE. Mohamed also met with the UCE, in-person, five times—the fifth being on July 26, 2019, the day defendants were arrested at the Tucson International Airport.

Mohamed brought his friend Hussein to his second meeting with the UCE in March 2019. In May 2019, Hussein started messaging with the UCE on Wickr. Hussein also met with the UCE and Mohamed in-person in June 2019 and went to the airport with them on July 26, 2019. Hussein, like Mohamed, told the UCE about his goal to make hijrah, join ISIS, kill kuffar, and become a martyr.

In their online messages and in-person meetings, defendants formulated a plan with the UCE to travel to Cairo, Egypt, where they would smuggle themselves into ISIS-controlled territory in the Sinai Peninsula so they could join ISIS as fighters. In online messages and in-person meetings, defendants talked about acts of violence they intended to commit once they joined ISIS and their goal of becoming martyrs. Defendants also talked several times about attacks within the United States they might consider doing if they weren't able to travel (because of their immigration status, defendants did not have passports and needed to obtain special travel documents to travel internationally).

The UCE will testify at trial about his online messages with defendants between December 2018 and July 2019 (Exs. 50-211) and his in-person meetings with them in February 2019 (Mohamed only), March 2019 (both defendants), April 2019 (Mohamed only) and June 2019 (both defendants), all of which were audio recorded (Exs. 250-271).

The UCE also will testify about driving defendants to the airport on July 26, 2019, which was video recorded (Exs. 272-276), and their time at the airport before being arrested.

Defendants were arrested in the gate area, after they had checked in and gone through TSA security, while waiting to board their flight.  (Defendants also saw agents "arresting" the UCE, who defendants believed was going to travel to Egypt with them.) Mohamed waived his *Miranda* rights and gave a post-arrest statement.  Although Mohamed initially claimed he was traveling to Egypt because his friend (Hussein) was getting married, he eventually admitted he was going to join ISIS.  The case agent, Special Agent Mutari, will testify about defendants' arrest and Mohamed's post-arrest statement (Exs. 359-386).  Special Agent Mutari also will testify about:

(i)     online, cell phone, and bank accounts used by defendants (Exs. 309-352),

(ii)    defendants' social media accounts (Exs. 450-469 & 500-587),

(iii)   items found on Mohamed's iPhone (Exs. 400-440; after authentication by the iPhone examiner, *see* Doc. 381), and

(iv)    steps defendants took before traveling including selling their cars (Exs. 486-493), buying plane tickets (Exs. 301-302) and joining a gym "so we can get little bit strong we will behead those kuffar and murtadin (*apostate*[6]) like animal in Sha Allah (*God willing*)" (Exs. 303-308).

The government plans to provide context for defendants' actions and the offenses through the testimony of Dr. Lorenzo Vidino.  As described in the government's notices regarding Dr. Vidino's testimony (Docs. 89 & 217), he will offer testimony about ISIS, the global jihadist movement, and associated FTOs discussed by defendants; terms and symbols in the government's exhibits; extremist propaganda and recruitment; radicalization; and hijrah. (*See* Doc. 217.)

## II.     Stipulations

To date, there are no stipulations among the parties.

---

[6] Murtad is an Arabic word for an individual who has rejected Islam. Murtadin is the plural of murtad/murtadd. *See*, *e.g.*, https://www.counterextremism.com/glossary.

The government tried to reach three stipulations with defense counsel, namely: (1) that ISIS was designated as a Foreign Terrorist Organization (FTO) for the time period alleged in the Superseding Indictment; (2) that certain certified business records could be admitted without requiring live testimony from a records custodian; and (3) that certain items found during the search of defendant Mohamed's iPhone could be admitted without requiring live testimony from the FBI Special Agent who extracted data from his phone. Because defendants would not stipulate, the government filed motions regarding #1 and #2. (*See* Docs. 430 & 431.)  As for #3, the government plans to call FBI Special Agent J. Patrick Cullen to authenticate items found on Mohamed's iPhone. (*See* Doc. 381.)

The government will continue to confer with defense counsel to see if any stipulations can be reached before trial.

**III.   Legal Issues**

**A.   Pending Motions**

The following motions concerning legal issues are pending.

**1.   Hussein's Motion to Sever**

Hussein's motion to sever his trial from Mohamed's trial, which Mohamed joined, is fully briefed. (*See* Docs. 201, 205, 219, 235, 302-303, 385, and 443.)

**2.   Mohamed's Motion to Suppress**

Mohamed's motion to suppress his post-arrest statement was fully briefed (*see* Docs. 199, 223, 241, and 305-306) and the Court held an evidentiary hearing in April 2023 and June 2023 (*see* Docs. 279-282, 295-299, 304).  Mohamed later asked to reopen the hearing to present expert testimony regarding a mental condition (*see* Docs. 341 and 349), and an evidentiary hearing is set for March 26-27, 2024, and April 1, 2024 (*see* Doc. 366).

**3.   Government's Motion for a Protective Order**

The government's motion, which seeks to protect the identity of certain witnesses and prevent unnecessary examination of witnesses regarding the FBI's undercover programs, is fully briefed (*see* Docs. 115, 123-124, 140, 193, 198, 380, 383, 445-447.)  As described in the government's filings, the government does not object to examination

regarding the UCE's and OCE-2's interactions with the defendants in this case, but revealing the true identity of the UCE and OCE-2, or examining them (or other witnesses) about their work in other investigations or the FBI's undercover programs more generally could reveal classified and sensitive information not probative with respect to the issues in this case.

### B.    Other Legal Issues

#### 1.  Jury Instructions

The parties submitted proposed jury instructions, including preliminary, mid-trial, and final instructions for the guilt phase of the trial, as well as instructions for the forfeiture phase of the trial.  Although most of the proposed instructions are stipulated, the disputed instructions raise legal issues.  The parties' positions and legal authority is included with the disputed instructions.

#### 2.  Defendants' Untimely Request for a *Daubert* Hearing

Defendants filed separate motions to exclude Dr. Lorenzo Vidino, the government's expert on ISIS and other pro-jihadist groups, to which the government filed a combined response.  (Docs. 344, 367, and 394.)  The government will not repeat here the legal and evidentiary issues discussed in the briefs; however, it will address defendants' belated request for an evidentiary hearing.

First, defendants' request is untimely.  Defendants' motions did not request an evidentiary hearing.  (See Docs. 344 and 367.)  When the Court asked counsel at the February 2, 2024, status conference whether evidentiary hearings would be necessary, they said no.  Defendants requested an evidentiary hearing for the first time in their replies. (Docs. 437 and 440; *but see* Doc. 320 at 2 ("Unless otherwise ordered by the Court, **replies are not permitted**….") (emphasis in original).

Second, an evidentiary hearing is unnecessary.  The court has "broad latitude" with respect to how it fulfills its gatekeeping role under Rule 702, and the Ninth Circuit has "consistently held that *Daubert* hearings are not required."  *United States v. Holguin*, 51 F.4th 841, 852 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 2509 (2023), and *cert. denied sub*

*nom. Higuera v. United States*, 143 S. Ct. 2510 (2023) (internal citations omitted); *see also United States v. Alatorre*, 222 F.3d 1098, 1103 (9th Cir. 2000) (citing decisions in the Seventh and Tenth Circuits, as well as Weinstein's Federal Evidence, for proposition that no pretrial evidentiary hearing is required with respect to expert testimony).  Defendants' replies do not identify any rationale for why a *Daubert* hearing is necessary, presumably because their argument is not that Dr. Vidino is unqualified or that his proffered testimony is unreliable, but rather that his testimony concerning ISIS, related terrorist groups, and the propaganda discussed and shared by both defendants lacks a "probative connection" to this case (Doc. 437 at 2) and is "inflammatory" and "too prejudicial to be allowed" (Doc. 440 at 2).  The government's combined response provides numerous examples of how Dr. Vidino's proffered testimony is directly connected to other evidence concerning the defendants that the government will introduce in this case, and his scholarly discussion of these topics will be no more "inflammatory" than the defendants' own statements and conduct. (*See* Doc. 394.)  The court can satisfy its gatekeeping role by reviewing the parties' briefing on the defendants' motions—including the numerous exhibits the government included with its response—and allowing oral argument, without a *Daubert* hearing. *See United States v. Calderon-Segura*, 512 F.3d 1104, 1109 (9th Cir. 2008) (affirming denial of *Daubert* hearing where court relied on pretrial briefing, review of "documentary evidence," and oral argument); *United States v. Mitchell*, 346 F. App'x 281, 283 (9th Cir. 2009) (affirming denial of *Daubert* hearing where "[e]xtensive pre-trial briefing and argument informed the court").

A *Daubert* hearing is particularly unnecessary for Dr. Vidino in this case given that he has testified numerous times regarding ISIS in other terrorism cases.  (*See* Doc. 394 at 7 & n.3 (referencing cases in which Dr. Vidino has provided expert testimony on ISIS and related terrorist groups).)  Mohamed's defense counsel observed his testimony and cross-examined him during the trial of an ISIS foreign fighter just last year.  *United States v. Asainov*, No. 19-CR-00402, Doc. 176 at 71 (E.D.N.Y. Feb. 1, 2023) (cross-examination of

1   Dr. Vidino by Ms. Shroff).[7]   In November 2023, the government provided to defense

2   counsel available transcripts of Dr. Vidino's prior testimony in eleven other cases (in

3   addition to copies of other materials he has written and transcripts of his testimony before

4   the U.S. Senate).  Defendants should be well aware of what his anticipated testimony will

5   consist of in this case.

6   　　　　If the Court does order that Dr. Vidino testify at a pretrial *Daubert* hearing, the

7   government respectfully requests that he be permitted to testify via remote video-link (such

8   as Zoom) given his pre-existing travel schedule and defendants' belated request.  The Court

9   similarly permitted Mohamed's expert, Dr. Robert Leonard, to testify via Zoom at a June

10   16, 2023, suppression hearing (after continuing the hearing twice at Mohamed's request).

11   *See* Docs. 243 and 280.  Dr. Vidino is currently outside of the United States and unable to

12   return until the trial starts on April 16, 2024.  The government will endeavor to make him

13   available to provide pre-trial testimony remotely, should the Court so require.

14   　　　　　　**3.  Mohamed's Defenses**

15   　　　　Mohamed filed notices regarding an entrapment defense (*see* Doc. 212) and intent

16   to introduce evidence of a mental condition (*see* Doc. 338).

17   　　　　The government believes the Court should give the Ninth Circuit's model jury

18   instruction on entrapment and plans to present evidence, including in its case-in-chief, to

19   prove that Mohamed was predisposed and not induced to commit the offenses.[8]   *E.g.*,

20   *Brooks v. Caterpillar Global Mining America, LLC*, 2017 WL 3401476, at *7 (W.D. Ky.

21   Aug. 8, 2017) ("Federal courts have repeatedly held that in a criminal case, the government

22   may offer evidence in its case-in-chief in anticipation of an expected defense.")

23   ───────────

24   　　　　[7] The court in *Asainov* rejected defendant's motion to preclude Dr. Vidino's testimony; the court's order was based solely on the parties' written briefs.  *See Asainov*, No. 19-CR-00402, Doc. 122 at 7-19 (E.D.N.Y. Jan. 13, 2023). Dr. Vidino reports that he

25   has not been required to testify at a *Daubert* hearing in any prior case.

26   　　　　[8] Although the government decided not to file a motion to preclude Mohamed's entrapment defense, courts, including the Ninth Circuit, have held it is proper to preclude

27   an entrapment defense where, as here, there is significant evidence of predisposition and lack of inducement.  *See, e.g.*, *United States v. Busby*, 780 F.2d 804, 807 (9th Cir. 1986);

28   *United States v. Rhodes*, 713 F.2d 463, 467 (9th Cir. 1983).

1       The government filed a motion to limit the testimony of defendants' mental health

2  experts, Drs. Stevan Weine and Jennifer Weller. (Doc. 434.)  As set forth in the

3  government's motion, the government does not object to Mohamed's right to present

4  evidence of an intellectual disability pursuant to Fed. R. Crim. P. 12.2(b) through expert

5  testimony.  The government does object to Mohamed's experts offering testimony that

6  goes well beyond the narrow scope of Rule 12.2(b), invades the province of the jury in

7  violation of Fed. R. Evid. 704(b), and is otherwise irrelevant, cumulative, and confusing.[9]

8          **4.  Hussein's Defenses**

9       Hussein filed a notice of intent to introduce evidence of a mental condition and later

10  withdrew it. (*See* Docs. 215, 278, 285, and the Court's April 19, 2023, sealed order.)

11  Hussein has not filed a notice of entrapment defense.  Accordingly, the government's

12  proposed jury instructions on entrapment and diminished capacity specify that they apply

13  only to Mohamed.  If Hussein suggests or implies that he was entrapped by Mohamed, the

14  government may ask the Court to give an appropriate jury instruction explaining derivative

15  entrapment is not a defense.  *See*, *e.g.*, *United States v. Thickstun*, 110 F.3d 1394, 1399 (9th

16  Cir. 1997) (rejecting defendant's argument that she was entrapped by her co-conspirator).

17          **5.  Hussein's Extremism Expert**

18       The government filed a motion to limit the testimony of Hussein's extremism

19  expert, Dr. Peter Chalk. (Doc. 432.)  As set forth in the motion, the government does not

20  object to Hussein's untimely expert notice or to Dr. Chalk offering relevant testimony,

21  including testimony about ISIS propaganda and recruiting efforts.  The government does

22  object to Dr. Chalk offering testimony (1) directly opining on Hussein's *mens rea* in

23  relation to the charged offenses, in contravention of Rule of Evidence 704(b); (2) invading

24  the province of the jury by commenting directly on the strength of the evidence;

---

25       [9] If Mohamed introduces evidence of a mental condition at trial through his noticed
experts, Drs. Weine and/or Weller, the government will likely call Dr. James P. Sullivan,
26  who conducted the government's Rule 12.2(c)(1)(B) examination of defendant Mohamed
(Doc. 365), during its rebuttal case.  Dr. Sullivan's report is due to be disclosed on or before
27  March 22, 2024 (*id.* at 6.) and any government notice of a rebuttal expert will be filed
shortly thereafter pursuant to Fed. R. Crim. P. 16(a)(1)(G).
28

(3) smuggling in inadmissible hearsay under the guise of an expert opinion; and (4) suggesting that defendants' conspiracy and attempt to join ISIS was factually impossible to carry out, which is not a defense and so irrelevant and likely confusing to the jury

### 6.  Judicial Notice that ISIS is an FTO

The government filed a motion asking the Court to take judicial notice that ISIS is designated as an FTO, as determined by the U.S. Secretary of State and published in the Federal Register.  (*See* Doc. 430.)

## IV.  Evidentiary Issues

### A.    Pending Motions in Limine

In addition to the motions discussed above, some of which raise legal and evidentiary issues, the following motions concerning evidentiary issues are pending.[10]

### 1.  Motion to Admit Certified Business Records

The government filed a motion seeking to admit certain certified business records without requiring live testimony from a records custodian.  (See Doc. 431.)  As discussed in the motion, admission of certified records without requiring live testimony from a records custodian will promote efficiency at trial and avoid the need to call more than a dozen witnesses from third-party custodians to provide duplicative foundation for self-authenticating records.

---

[10]  The government may file a motion in limine regarding the testimony of a confidential human source (CHS) who defendants confirmed today that they intend to call. On March 7, 2024, after the March 4 deadline for filing motions in limine, Hussein's counsel told the government that defendants "intend to call as a witness the confidential informant who befriended Mr. Mohamed" and asked whether the government would make the CHS available for the defense.  In an effort to identify which CHS (of the six involved in the investigation) defendants intended to call, the government exchanged several emails with defense counsel over the next few days.  On March 12, 2024, the government sent a list of disclosures related to the CHSs (previously provided to defense in December 2021 and again in March 2022) and asked defense counsel to confirm they were referring to CHS-A. Today, March 18, 2024, Mohamed's counsel confirmed that defendants intend to call CHS-A at trial. The government is currently evaluating defendants' request and whether to file a motion in limine to limit the scope of defendants' examination, as well as to request some or all of the trial protective measures the government has requested for the UCE and OCE-2.

1

### 2.  Hussein's Cell Phone Motion

Hussein's motion asks the Court to broadly exclude everything he may have sent or received on his cell phone, regardless of how the government obtained it.  (*See* Doc. 435.) As discussed in the government's response (Doc. 449), Hussein's motion should be denied because it misrepresents the government's agreement not to search his cell phone, Hussein has no reasonable expectation of privacy in messages he voluntarily sent to the UCE, and his messages to the UCE are relevant and not unfairly prejudicial.

### 3.  Mohamed's Graphic Images Motion

Mohamed's motion asks the Court to exclude all images and videos depicting graphic violence that he sent to OCE-2 or the UCE or posted to his social media accounts. (*See* Doc. 436.)   As discussed in the government's response (Doc. 450), Mohamed's motion should be denied because the images and videos Mohamed affirmatively shared with others are directly relevant to the charges against him and his entrapment defense, and they are not unfairly prejudicial given the nature of the charges against him and the government's significant efforts to limit the selection of images and videos to be used at trial.

### B.    Other Evidentiary Issues

### 1.  Case Agent Testimony

To make its presentation to the jury more effective for determining the truth and avoid wasting time (*see* Fed. R. Evid. 611(a)), the government plans to call the case agent, Special Agent Mike Mutari, to testify at the beginning of the government's case-in-chief and again toward the end of its case-in-chief.  At the beginning of the government's case, the government plans to have Special Agent Mutari give the jury a brief overview of the investigation and explain defendants' social media and online accounts used to exchange messages with OCE-2 and the UCE (as reflected in Exhibit A hereto).  The government expects this initial testimony from Special Agent Mutari to be limited to evidentiary foundation testimony.  The government plans to call Special Agent Mutari again toward the end of its case-in-chief to testify about several additional issues including items found

on Mohamed's iPhone and social media accounts, steps defendants took before traveling, their arrest, and Mohamed's post-arrest statement (*see* pgs. 2-3, above).

### 2. Clips of Audio and Video Recordings

Defendants' meetings with the UCE were audio recorded and their car ride to the airport on July 26, 2019, was video recorded. The recordings of their meetings and car ride total approximately 10 hours. To promote efficiency, the government does not plan to play all the recordings for the jury, only key excerpts. The government also will not seek to admit all the recordings, only the excerpts played for the jury at trial. *See United States v. Noushfar*, 78 F.3d 1442, 1444-45 (9th Cir. 1996) (holding it was error to allow jury to listen to audio recordings that had not been played in the courtroom). To assist the jury, the government plans to show a scrolling transcript when the excerpt is played for the jury, as it did at the suppression hearing in April 2023. (The transcript will not be admitted, only the recording itself.)

The government is working to finalize a list of excerpts it intends to play at trial and plans to provide the list to defense counsel in advance of the final pretrial conference, so the parties can attempt to resolve in advance of trial any disputes as to whether additional context is needed for the government's excerpts. *See* Fed. R. Evid. 106. Aside from introducing portions of the recordings "that in fairness ought to be considered at the same time" (*id*.), defendants cannot introduce their own self-serving hearsay in the recordings. *See*, *e.g.*, *United States v. Liera-Morales*, 759 F.3d 1105, 1111 (9th Cir. 2014) (affirming exclusion of the defendant's self-serving hearsay, noting the Court "carefully and thoroughly considered the government's proffered statements … and correctly determined that those statements were neither misleading nor taken out of context").

Should defendants try to suggest through questioning or argument that the government's excerpts are misleading or out of context—for example, if Mohamed suggests that other parts of the recordings would support his entrapment defense—the

///

///

- 12 -

government will request the Court give an appropriate curative instruction.[11]  The Ninth Circuit recently approved of such a curative instruction in *United States v. Rodriguez*, 971 F.3d 1005, 1015-16 (9th Cir. 2020).   In *Rodriguez*, "defense counsel's aggressive objections and cross-examination [about the government's selected recordings and transcripts] 'improperly suggested that [law enforcement] intentionally withheld relevant evidence from … the jury.'"  At the government's request, the district court gave the following curative instruction:

> You heard testimony with regard to how the recorded passages you heard were selected.  You also heard that the government did not prepare the complete transcripts for some recordings.
>
> Once the government produced a recording, any party was free to make its own transcription.
>
> An opposing party is free to request the Court to order additional portions of a recording be played where necessary to place the portions played in context or to avoid any misleading impression resulting from just the portions played.

*Id*.  The Ninth Circuit held "the district court did not abuse its wide discretion in giving the curative instruction," which "aligned with the substance of Rule 106 and thus did not constitute legal error."  *Id*. at 1116.  The Ninth Circuit rejected defendant's claim that the instruction was impermissible "burden shifting," stating that "informing the jury that any party could seek to present certain evidence is distinct from telling the jury a party was required to do so—and the remaining jury instructions eliminated any possible doubt as to the burden of proof.  The jury was otherwise instructed that the defense did not need to present any evidence, and that the government bore the burden of proving every element of the charges beyond a reasonable doubt."  *Id*.

///

///

---

[11]  Alternatively, the government could play all of the recordings in their entirety (10-plus hours). The government is reluctant to do that, however, as it would be cumulative and significantly extend the length of the trial. *See* Fed. R. Evid. 403 and 611(a).

### 3.  Mohamed's Exhibit List

At defense counsel's request, the Court ordered the parties to exchange exhibit lists on August 11, 2023.  (See Doc. 277.)  Although Mohamed's counsel sent a draft exhibit list to the government on August 11, 2023, they said the list was "incomplete and will be supplemented."  In addition to being "incomplete," one of the items on Mohamed's draft exhibit list does not identify specific exhibits but rather lists a general category of documents.  Specifically, Exhibit H on Mohamed's exhibit list says "SMP texts from Mohamed on Tumblr, Telegram, Facebook, and Wickr dependent upon what is noticed by the Government or necessary for impeachment (Productions 1, 4, 6, 14, 25, 26, 27)."  The seven productions Mohamed identifies as "Exhibit H" contain more than 800 separate files including PDFs totaling thousands of pages.

The government has asked Mohamed's counsel for an updated exhibit list twice in recent weeks (first on March 1, 2024, and again on March 11, 2024) and it is unknown when they will provide one before trial.  Accordingly, the government may seek permission to file a motion in limine if Mohamed's updated exhibit list includes exhibits the government believes are objectionable.  The government also may seek to exclude evidence identified on Mohamed's updated exhibit list that has not been timely disclosed or reasonably identified.

### 4.  Hussein's Exhibit List

Hussein's draft exhibit list, which his counsel sent on August 11, 2023, identified several exhibits related to his withdrawn notice of mental condition, discussed above, including the report of Dr. Akinsulure-Smith (his mental health expert).  The government asked Hussein's counsel whether and how they plan to use the exhibits at trial, given their withdrawal.  His counsel responded "We do not intend to use any of [Hussein's] mental health records, including Dr. Akinsulure-Smith's report, at trial.  We included them on the exhibit list in an abundance of caution for possible use in the penalty phase."  Given the assurances by Hussein's counsel, the government did not file a motion in limine.  If

Hussein's counsel attempts to introduce exhibits or testimony at trial related to his withdrawn mental condition defense, the government will object.

On March 1, 2024, and again on March 11, 2024, the government asked Hussein's counsel for an updated exhibit list.  To date, Hussein's counsel has not responded.  The government therefore assumes they have made no changes to the draft list they provided on August 11, 2023, which identified numerous exhibits by Bates number.

**V.    Other Pertinent Issues**

The government is not aware of any other pertinent issues at this time.

**VI.    Charts/Summaries**

The government plans to use four summary charts at trial, which are attached to this trial brief as Exhibits A-D:

> A.    A chart identifying the various online accounts and phone numbers used by defendants and the corresponding exhibit numbers;
>
> B.    A chart identifying the dates of Mohamed's messages to OCE-2 with the corresponding exhibit and page numbers;
>
> C.    A chart identifying the dates of Mohamed's messages to the UCE with the corresponding exhibit and page numbers; and
>
> D.    A chart identifying the dates of Hussein's messages to the UCE with the corresponding exhibit and page numbers.

These charts summarize certain aspects of voluminous documents the government plans to use at trial, Fed. R. Evid. 1006, and will make the presentation of evidence more effective for determining the truth and avoid wasting time.  Fed. R. Evid. 611(a).[12]

The government's first summary chart, Exhibit A, will assist the jury in reviewing the voluminous messages defendants sent to OCE-2 and the UCE, as well as Mohamed's social media posts.  Defendants used multiple accounts on different platforms and various

---

[12]  Should the government supplement any of the attached summary charts before trial, it will provide a copy of the updated chart to the Court and defense counsel.  For example, if defendants challenge attribution of the online accounts, the government may add information explaining how each account is attributed to each defendant.

fake names or "handles" to post to social media and exchange messages with OCE-2 and the UCE. The government can attribute all of those "handles" to defendants through certified business records and testimony.

For example, the UCE will testify that (i) he arranged in-person meetings with defendants by exchanging online messages with their accounts (listed below), (ii) defendants arrived at those meetings, and (iii) he exchanged more online messages after the meetings, including messages about the meetings—all of which confirm defendants were sending and receiving messages about the meeting.

| Meeting date | Defendant(s) | Account(s) used to arrange | Exhibit(s) |
|---|---|---|---|
| 2/1/2019 | Mohamed | Abu Mohamed (Telegram) | 78 |
| 3/12/2019 | Both | Abu Mohamed (Telegram) | 100 |
| 4/22/2019 | Mohamed | abumohamed (Wickr) | 120 |
| 6/24/2019 | Both | abujihad123 (Wickr)<br>abumohamed (Wickr) | 159<br>161 |
| 7/26/2019 | Both | abumohamed Wickr<br>abujihad123 (Wickr) | 209<br>211 |

The other charts summarize the dates of defendants' messages with OCE-2 (Exhibit B) and the UCE (Exhibits C and D). Because of how the encrypted messaging apps are set up, the date of a particular message is not always obvious on the face of the message. Dates of messages are reflected in memos prepared by OCE-2 and the UCE, to which the messages were attached. The government marked the memos on its exhibit list to refresh the recollection of witnesses, if needed, but does not plan to admit them. It would be much more efficient at trial to use the summary charts regarding the dates of messages to orient the witness and jury as to the date of a particular message, rather than having the witness review numerous memos to refresh their recollections as to the date of a particular message.

///

///

///

The summary charts regarding the dates of messages also will assist the jury when it reviews the evidence during its deliberations.

Respectfully submitted this 18th day of March 2024.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/M. Bridget Minder*
M. BRIDGET MINDER
Assistant U.S. Attorney

Copy of the foregoing served
electronically or by other means
this 18th day of March 2024, to:

All ECF recipients